ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2019 APR 24  PM 1: 19

DEPUTY CLERK_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

UNITED STATES OF AMERICA

v.

ANDREW SCHERR (01)
ROBERT MCGRAW (02)

No. **3-19CR-225-S**

**FILED UNDER SEAL**

## INDICTMENT

The Grand Jury Charges:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.    Insurance is designed to protect consumers from financial loss resulting from unknown future events.   In a common insurance transaction, a consumer pays a fixed fee—also known as a "premium"—to an insurance company in exchange for an insurer's promise to pay future claims arising from a defined event.

2.    An insurance company's ability to pay claims to its policyholders depends on the insurance company having sufficient assets or funds available.   To pay consumer claims, an insurance company may draw on policyholder premiums that it has invested or on assets or funds held by the insurance company or its reinsurers.

3.    An insurance company may share its risks of payment on claims with another company through "reinsurance," whereby the insurance company cedes a portion of the premiums earned on its policies—along with the risk of paying claims on those policies—

to another company (or the "reinsurer").   The reinsurer can then invest its share of the premiums.   To ensure that a reinsurer can pay future claims, a reinsurance contract may place restrictions on a reinsurer's investments and may require that a reinsurer hold low-risk investments in a trust account.

4.      An insurance company can invest those premiums to generate revenue.   To ensure that insurance companies or reinsurers can pay future claims, state laws and regulations restrict how insurance companies and reinsurers may invest their funds, often requiring investment in low-risk holdings such as cash or government bonds.

<u>The Defendants & Related Entities</u>

5.      Southport Lane Management, LLC, Southport Lane, LP, and several of its affiliated companies (collectively "Southport") were incorporated in Delaware.   Among other things, Southport marketed itself to insurance companies as a private equity investment holding company specializing in asset management for insurance companies. Southport also acquired several insurance companies and provided investment strategy services.   As of July 2012, Southport had an office in New York, New York.   At all relevant times, Southport utilized an e-mail service with servers outside Texas that stored electronic communications sent and received by Southport's employees.

6.      **ANDREW SCHERR** served as Southport's Chief Financial Officer from in or around 2011 to at least in or around 2016.

7.      **ROBERT MCGRAW** served as Southport's Executive Director from in or around 2012 to at least in or around 2016.

8.      Individual A served as an executive at Southport from in or around 2010 to in or around January 2014.

9.      Administrative Agency Services, LLC ("AAS") was a Southport-affiliated entity that, among other things, purported to provide valuation services.

10.     Green Moss Partners, LLC ("Green Moss Partners") was a Southport-affiliated entity formed under Delaware law. At relevant times during the scheme to defraud, **SCHERR** acted as a representative of Green Moss Partners.

11.     Metcom Network Services ("Metcom") was a small, privately held fiber optics company based in New York.

<u>Relevant Companies and Entities</u>

12.     Insurance Company A was a licensed insurer based in Dallas, Texas, that primarily offered workers' compensation policies.  Insurance Company A also provided reinsurance services including through its affiliated companies.  On or about March 12, 2013, Southport acquired Insurance Company A.   Insurance Company A maintained an e-mail server in Dallas, Texas, that stored electronic communications sent and received by Insurance Company A employees.

13.     Insurance Company B was a licensed insurer based in Louisiana.  On or about May 29, 2013, Southport acquired Insurance Company B.

14.     Insurance Company C was a licensed insurer based in South Carolina. Insurance Company A and its affiliated companies were reinsurers for Insurance Company C.

15.     Insurance Company D was a licensed insurer based in South Carolina with its servicing headquarters located in Tennessee.   Insurance Company A and its affiliated companies were reinsurers for Insurance Company D.

16.     Insurance Company E was a licensed insurer based in New York.   Southport provided reinsurance services for Insurance Company E.

17.     Bank A was a federally insured depository institution with a branch in Wilmington, Delaware.   Bank A administered trust accounts and held investment portfolios for the benefit of Insurance Company A, Insurance Company B, Insurance Company C, Insurance Company D, and Insurance Company E (collectively, the "Victim Insurance Companies").

The Purpose of the Scheme to Defraud

18.     The purpose of the scheme was for **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators to enrich themselves and other Southport employees by defrauding the Victim Insurance Companies of cash and valuable assets through fraudulent representations and omissions of material facts.

Overview of the Scheme to Defraud

19.     From at least in or around 2012 through at least in or around 2016, **SCHERR**, **MCGRAW**, Individual 1, and others known and unknown to the Grand Jury, agreed and conspired to defraud insurance companies by causing Southport to (i) create fraudulently overvalued and illiquid securities, and false and fraudulent documentation regarding the purported value of those securities; (ii) gain access to the investment portfolios, trusts, and

4

assets of the Victim Insurance Companies; and (iii) strip the Victim Insurance Companies of cash and other valuable assets by replacing those assets with the fraudulently overvalued and illiquid securities created by **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators.

20.     First, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators caused Southport to create several classes of fraudulently overvalued and illiquid securities.   In addition, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators caused Southport, including through AAS, to provide false and misleading information about the value and nature of these fraudulently overvalued and illiquid securities to Bank A, insurance companies, and insurance regulators.   In truth and in fact, these fraudulently overvalued and illiquid securities were not worth the values ascribed to them by **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators.   These securities were, in many instances, backed by only limited partial interests in assets of disputed or inflated value, such as a painting of questionable origin, authenticity, and value, and shares of Metcom, a company with limited revenue.

21.     Second, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators caused Southport to acquire Insurance Company A and Insurance Company B.   Southport, Insurance Company A, and its affiliated companies provided reinsurance services for Insurance Company C, Insurance Company D, and Insurance Company E.   As a result of these relationships, Southport, at the direction of **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators, gained access to the investment portfolios, trusts, and other assets of

the Victim Insurance Companies, which contained cash and other liquid assets that these insurance companies maintained, in part, to pay future claims by policyholders.

22.     Third, after gaining access to the investment portfolios, trusts, and other assets of the Victim Insurance Companies, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators caused Southport to replace cash and other liquid assets in the investment portfolios and trusts of the Victim Insurance Companies for fraudulently overvalued and illiquid securities created at the direction of **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators.     **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators fraudulently misrepresented the nature and value of these securities to the Victim Insurance Companies.

23.     As a result of the scheme, the Victim Insurance Companies were stripped of cash and other legitimate and liquid assets and left with fraudulently overvalued (in some instances worthless) and illiquid securities in their investment portfolios and trusts. **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators used the cash and assets from the Victim Insurance Companies to enrich themselves and further the fraudulent scheme.   As a result of the scheme, the Victim Insurance Companies have collectively suffered hundreds of millions of dollars in losses and have, in many cases, been unable to fully pay policyholder claims.

### SCHERR, MCGRAW, Individual 1, and Their Co-Conspirators
### Create the First Group of Fraudulently Overvalued and Illiquid Securities

24.     Between in or around the summer of 2012 and October 2012, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators created the Destra Targeted Income Unit Investment Trusts, which originally consisted of: (i) Destra Targeted Income Unit Investment Trust Series I; (ii) Destra Targeted Income Unit Investment Trust Series II; and (iii) Destra Targeted Income Unit Investment Trust Series III (collectively "Destra UIT Series I, II, and III"). **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators planned to use fraudulently overvalued and illiquid shares of Destra UIT Series I, II, and III to trade for cash and other assets held by the Victim Insurance Companies.

25.     When Destra UIT Series I, II, and III were created, the trusts existed but contained no cash or assets. Southport sought to acquire the cash to fund Destra UIT Series I, II, and III from Insurance Company A.

26.     Southport provided Insurance Company A with an "investment overview" of Destra UIT Series I, II, and III on or about September 27, 2012. **SCHERR, MCGRAW**, Individual 1, and their co-conspirators created this "investment overview" and knew about the representations contained therein. According to the overview, the assets held by the Destra UITs consisted of the following: (i) 60% U.S. government securities, which according to a disclaimer did not include investments in derivative securities; (ii) 36% "TIO Asset Backed Securities," which purportedly consisted of investments in "non-real estate tangible assets;" and (iii) 4% loan payments issued to Premium Wine Acquisitions that were secured by "real property and agricultural equipment."

27.     On or about October 1, 2012, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators induced Insurance Company A to purchase fraudulently overvalued shares of Destra UIT Series I, II, and III through Bank A for approximately $30,000,000. **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators knew that Destra UIT Series I, II, and III were not yet funded when Insurance Company A purchased these shares. Thus, as **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators knew, the investment overview provided to Insurance Company A was false and fraudulent because Destra UIT Series I, II, and III did not actually hold any of the assets identified in the overview.

28.     **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators used a portion of Insurance Company A's $30,000,000 investment to further the scheme and enrich themselves.  Specifically, on or about October 16, 2012, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators wired, or caused to be wired, approximately $640,000 to accounts controlled by Southport employees, including a wire of $350,000 to a bank account controlled in whole or in part by **SCHERR**, and a wire of $100,000 to a bank account held by Individual 1.   Additionally, on or about October 3, 2012, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators wired, or caused to be wired, approximately $3,000,000 to an account controlled by Southport.

29.     **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators used a portion of Insurance Company A's $30,000,000 investment to purchase interests in assets that would be held by Destra UIT Series I, II, and III, including: (i) shares in a company

that made derivative investments in U.S. government bonds; (ii) a vineyard in Long Island, New York; and (iii) a limited interest in a purported original painting by Michelangelo Caravaggio, titled *David with the Head of Goliath* (the "Caravaggio Painting").

SCHERR, MCGRAW, Individual 1, and Their Co-Conspirators
Misrepresent Southport's Interest in the Caravaggio Painting

30.     On or about October 1, 2012, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators, through Southport and AAS, represented to Bank A, which Southport had engaged to serve as the trustee for Destra UIT Series I, II, and III, that these UITs had a collective $195,000,000 in value and were secured by assets including a $128,000,000 interest in the Caravaggio Painting.

31.     In truth and in fact, however, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators knew that the representation to Bank A was false, because they knew that the purported $128,000,000 interest in the Caravaggio Painting, which made up the bulk of the $195,000,000 valuation for the Destra UITs, was fraudulently and grossly overvalued for several reasons.

32.     First, as **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators knew, neither Southport nor the Destra UITs held any interest in the supposed Caravaggio Painting when Destra UIT Series I, II, and III were formed on or about October 1, 2012. Rather, Destra UIT Series I, II, and III, through Southport, did not acquire any interest in the Caravaggio Painting until at least on or about October 25, 2012.

33.     In addition, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators knew the limited interest in the Caravaggio Painting that Southport acquired on or about

October 25, 2012, was only worth a small fraction of the alleged $128,000,000 value that **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators represented to Bank A through Southport and AAS.

34.     In or around October 2012, **SCHERR** and others, acting on behalf of Green Moss Partners, began negotiations to acquire an interest in an alleged Caravaggio Painting from a Florida trust (the "Caravaggio Trust"). During the negotiations, **SCHERR** was provided with conflicting conclusions as to the authenticity and value of the Caravaggio Painting, including one appraisal listing the value of the artwork at $125,000,000, and another report finding that the Caravaggio Painting was not an original.

35.     On or about October 25, 2012, **SCHERR**, representing and signing documents on behalf of Green Moss Partners, entered into an agreement with the Caravaggio Trust to acquire a limited interest in the Caravaggio Painting. In exchange for that interest, the Caravaggio Trust received a payment of $610,000 and a promissory note for approximately $15,000,000 that was signed by **SCHERR** and guaranteed by Southport.

36.     As part of the transaction, title in the Caravaggio Painting transferred to Green Moss Partners. However, Green Moss Partners' interest in the painting was limited by, among other things: (i) Green Moss Partners could not sell, exchange, or otherwise dispose of the Caravaggio Painting without express written consent; (ii) Green Moss Partners could not permit a security interest to attach to the painting without prior consent; (iii) the Caravaggio Trust retained possession of the Caravaggio Painting, and Green Moss Partners could not access the painting without prior written consent; (iv) the Caravaggio

Trust held three irrevocable options to repurchase the painting through December 2015; and (v) the Caravaggio Trust received a "first priority purchase money mortgage security interest and lien" on the painting.   Furthermore, **SCHERR** was able to conceal Southport's limited interest in the painting by convincing the Caravaggio Trust not to file any documentation providing the public with notice of the Caravaggio Trust's lien on the painting.

37.     Despite the explicit restriction barring Green Moss Partners from selling its interest in the Caravaggio Painting without the express written consent of the Caravaggio Trust, on or about October 25, 2012—the same date **SCHERR** and Green Moss Partners acquired an interest in the Caravaggio Painting—**SCHERR** sold the interest in the Caravaggio Painting to Southport in exchange for a $38,500,000 promissory note.

38.     Southport used approximately $850,000 of Insurance Company A's initial investment to pay approximately $240,000 to a third party as a fee for his role in the transaction, while the Caravaggio Trust received approximately $610,000.   To date, the Caravaggio Trust has received approximately $1,570,000 from Southport through Green Moss Partners in exchange for the limited interest that **SCHERR, MCGRAW**, Individual 1, and their co-conspirators had represented to Bank A was worth approximately $128,000,000.   Neither Southport nor any of its affiliates ever took possession of the

Trust held three irrevocable options to repurchase the painting through December 2015; and (v) the Caravaggio Trust received a "first priority purchase money mortgage security interest and lien" on the painting. Furthermore, **SCHERR** was able to conceal Southport's limited interest in the painting by convincing the Caravaggio Trust not to file any documentation providing the public with notice of the Caravaggio Trust's lien on the painting.

37. Despite the explicit restriction barring Green Moss Partners from selling its interest in the Caravaggio Painting without the express written consent of the Caravaggio Trust, on or about October 25, 2012—the same date **SCHERR** and Green Moss Partners acquired an interest in the Caravaggio Painting—**SCHERR** sold the interest in the Caravaggio Painting to Southport in exchange for a $38,500,000 promissory note.

38. Southport used approximately $850,000 of Insurance Company A's initial investment to pay approximately $240,000 to a third party as a fee for his role in the transaction, while the Caravaggio Trust received approximately $610,000. To date, the Caravaggio Trust has received approximately $1,570,000 from Southport through Green Moss Partners in exchange for the limited interest that **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators had represented to Bank A was worth approximately $128,000,000. Neither Southport nor any of its affiliates ever took possession of the Caravaggio Painting.

39. **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators thus knew that Southport's limited interest in the Caravaggio Painting represented a small fraction of

11

the painting's overall worth based on the Caravaggio Trust's: (i) right to repurchase the painting; (ii) priority lien; and (iii) right to possess the painting. Further, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators knew that the authenticity and value of the painting were disputed, that the $15,710,000 price reflected both the limited interest in the painting and concerns about the painting's authenticity, and that there was an outstanding and unpaid balance of over $14,000,000 on the note.

40.    Despite this knowledge, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators falsely represented to Bank A that Southport's interest in the Caravaggio Painting was worth over $128,000,000, and that the combined net asset value of Destra UIT Series I, II, and III was approximately $195,000,000. In addition, AAS was responsible for providing Bank A with asset valuations for Destra UIT Series I, II, and III on a quarterly basis. Based in part on these false and fraudulent valuations, from in or around October 2012, to in or around January 2014, Bank A continued to rely on Southport's representation that the combined net asset value of Destra UIT Series I, II, and III during this time period was approximately $195,000,000.

### SCHERR, MCGRAW, Individual 1, and Their Co-Conspirators Gain Control of Insurance Company A to Further the Fraudulent Scheme

41.    As part of the transaction to acquire Insurance Company A, Southport was required to satisfy certain state regulatory requirements and obtain approvals from state regulators, including the Texas Department of Insurance ("TDI"). One condition imposed by TDI was that Southport inject $50,000,000 in cash into Insurance Company A at the closing date, which was set for on or about March 12, 2013.

42.     In order to obtain the necessary approvals from TDI, among other things, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators made false and fraudulent representations to TDI about Southport's assets and capital contributions, Southport's investors, and the availability and use of cash funds for closing of the acquisition.

43.     **MCGRAW** and Individual 1 knew that Southport did not have $50,000,000 in cash to inject into Insurance Company A.   Thus, on or about March 11-12, 2013, **MCGRAW** and Individual 1 created, or caused to be created, the "Beaconsfield Securities" that they valued at approximately $50,000,000.   **MCGRAW** and Individual 1 knew at the time the Beaconsfield Securities were created that they were not worth $50,000,000, as the value for the Beaconsfield Securities was wholly derived from owning shares of the fraudulently overvalued and illiquid Destra UIT Series I, II, and III.

44.     Ultimately, based on the misrepresentations of **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators, TDI approved Southport's acquisition of Insurance Company A.   In or around March 2013, Southport acquired Insurance Company A, and in or around May 2013, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators schemed to create the illusion of $50,000,000 in cash being injected into Insurance Company A, when in reality Insurance Company A only received fraudulently overvalued and illiquid Beaconsfield Securities.

45.     Between March 2013, and in or around January 2014, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators caused Bank A to exchange cash and liquid assets in the investment portfolios or trusts for Insurance Company A and Insurance

13

Company B, which Southport acquired on or about May 29, 2013, with fraudulently overvalued and illiquid shares of Destra UIT Series I, II, and III.

46.     **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators also caused Bank A to replace cash and liquid assets in trust accounts of Insurance Company C, Insurance Company D, and Insurance Company E with fraudulently overvalued and illiquid shares of Destra UIT Series I, II, and III.   Bank A then provided account statements to the Victim Insurance Companies that reflected overvalued holdings in Destra UIT Series I, II, and III.

### SCHERR, MCGRAW, Individual 1, and Their Co-Conspirators Create Additional Series of Fraudulently Overvalued Destra Securities

47.     In or around October 2013, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators conspired to create two additional series of Destra UITs, purportedly backed in part by a limited interest in a small fiber optic company and other assets. Specifically, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators conspired to create: (i) Destra Targeted Income Unit Investment Trust Series IV; and (ii) Destra Targeted Income Unit Investment Trust Series V (collectively "Destra UIT Series IV and V").

48.     As with Destra UIT Series I, II, and III, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators, through Southport and AAS, were responsible for providing documentation to Bank A showing the "net asset value" of the assets held in the Destra UITs.

49.     On or about November 21, 2013, **SCHERR**, **MCGRAW**, and Individual 1,

through Southport and AAS, falsely represented to Bank A that the assets held by Destra UIT Series IV and V were collectively worth $140,000,000 and consisted of $100,000,000 of "shares" purportedly providing an interest in Metcom (the "Fiber Optic Shares") and other assets.

50.     Based on the representations made by **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators, through Southport and AAS, Bank A created Destra UIT Series IV and Series V on or about November 21, 2013 and, Bank A relied upon Southport and AAS's representations that the combined net asset value of these trusts was $140,000,000.

51.     In truth and in fact, however, when Destra UIT Series IV and V were formed, the Fiber Optic Shares were worth only a small fraction of the purportedly $100,000,000 value that **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators had represented to Bank A.

52.     Specifically, Metcom was a small company with limited revenue.  In or around November 2013, **SCHERR** caused Metcom to create the Fiber Optic Shares and loan them to a holding company for five years in exchange for an initial payment of $300,000, and annual payments of $800,000.   The holding company then, in turn, sold the loaned Fiber Optic Shares to Southport in exchange for two promissory notes totaling $80,000,000.  To date, Southport has not made any payments under these promissory notes.   Thus, Southport, at most, borrowed or leased the Fiber Optic Shares for five years, agreed to pay substantially less for the Fiber Optic Shares than their alleged $100,000,000 value, and made no payments for the Fiber Optic Shares.

53.     Despite the limited value of Southport's interest in the Fiber Optic Shares, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators continued to falsely represent to Bank A that Southport's interest in the Fiber Optic Shares was worth over $100,000,000.   In addition, AAS was responsible for providing Bank A with asset valuation for Destra UIT Series IV and V on a quarterly basis.   Based in part on these false and fraudulent valuations, from in or around November 2013, to in or around January 2014, Bank A continued to rely on Southport's representation that the combined net asset value of Destra UIT Series IV and V during this time period was approximately $140,000,000.

54.     Between in or around November 2013 and in or around January 2014, **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators caused Bank A to exchange cash and liquid assets from the investment portfolios and trusts for the Victim Insurance Companies for fraudulently overvalued and illiquid shares of Destra UIT Series IV and Series V.   Bank A then provided account statements to the Victim Insurance Companies that reflected overvalued holdings in Destra UIT Series IV and V.

<u>Impact of the Fraudulent Scheme</u>

55.     As a result of the scheme perpetrated by **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators, the Victim Insurance Companies have suffered financial losses that may impact their ability to pay policyholder claims.

56.     Specifically, after **SCHERR**, **MCGRAW**, Individual 1, and their co-conspirators converted the majority of the cash and liquid assets in the investment portfolio and trusts of Insurance Company A into fraudulently overvalued and illiquid securities and

fraudulent financial instruments, Insurance Company A was placed into liquidation on or about August 15, 2014.

57.    Insurance Company B, Insurance Company C, and Insurance Company D have suffered substantial losses from having cash and other valuable assets converted into fraudulently overvalued and illiquid securities.

## COUNT ONE
(18 U.S.C. § 371 – Conspiracy to Commit Crimes By or Affecting
Persons Engaged in the Business of Insurance)

58.     Paragraphs 1 through 57 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

59.     From at least in or around 2012 through at least in or around 2016, in the Northern District of Texas, and elsewhere, defendants **ANDREW SCHERR** and **ROBERT MCGRAW** did willfully, that is with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit offenses against the United States, namely while engaged in the business of insurance and whose activities affect interstate commerce and while being involved (other than as an insured or beneficiary under a policy of insurance) in a transaction relating to the conduct of affairs of such a business did: (a) willfully embezzle, abstract, purloin, and misappropriate any of the moneys, funds, premiums, credits, and other property of such person so engaged in the business of insurance; and (b) knowingly make a false entry of material fact in a book, report, and statement of such person engaged in the business of insurance with the intent to deceive any person, including any officer, employee, and agent of such person engaged in the business of insurance, any insurance regulatory official and agency, and any agent and examiner appointed by such official and agency to examine the affairs of such person, about the financial condition or solvency of such business, in violation of Title 18, United States Code Sections 1033(b) and (c).

Purpose of the Conspiracy

60.     The Grand Jury realleges and incorporates by reference paragraph 18 of this Indictment as though fully set forth herein as a description of the purpose of the conspiracy.

Manner and Means of the Conspiracy

61.     In furtherance of this conspiracy, and to accomplish its object, the methods, manner, and means that were used are described in paragraphs 19 through 54 of this Indictment and are realleged and incorporated by reference as though fully set forth herein.

Overt Acts

62.     In furtherance of the conspiracy and to effectuate the purpose thereof, at least one of the co-conspirators committed and caused to be committed, in the Northern District of Texas, and elsewhere, the following overt acts, among others:

63.     On or about September 27, 2012, Individual 1 provided Insurance Company A with an "investment overview" of the Destra UITs, which stated that assets held by Destra UITs included:   (a) 60% U.S. government securities, which according to a disclaimer did not include investments in derivative securities; (b) 36% "TIO Asset Backed Securities," which purportedly consisted of investments in "oil [and] gas reserves and other non-real estate tangible assets"; and (c) 4% loan repayments issued to Premium Wine Acquisitions that were secured by "real property and agricultural equipment."

64.     On or about October 19, 2012, **SCHERR** provided TDI with an affidavit accompanying the financial statements of Southport and certifying that the financial statements were a "true and correct presentation of the financial condition" of Southport.

65.     In or around March 2013, **MCGRAW** and Individual 1 created, or caused to be created, the Beaconsfield Securities to create the illusion of $50,000,000 in connection with Southport's acquisition of Insurance Company A.

66.     In or around September 2013, **MCGRAW**, **SCHERR**, and Individual 1 caused Bank A to transmit a statement to Insurance Company A, reflecting fraudulently overvalued shares of Destra UIT Series I, II, and III.

67.     In or around October 2013, **MCGRAW**, **SCHERR**, and Individual 1 caused Bank A to transmit a statement to Insurance Company A, reflecting fraudulently overvalued shares of Destra UIT Series I, II, and III.

68.     In or around January 2014, **MCGRAW**, **SCHERR**, and Individual 1 caused Bank A to transmit a statement to Insurance Company A, reflecting fraudulently overvalued shares of Destra UIT Series I, II, III, IV, and IV.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

(18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud Affecting a Financial Institution)

69.    Paragraphs 1 through 57 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

70.    From at least in or around 2012 through at least in or around 2016, in the Northern District of Texas, and elsewhere, defendants **ANDREW SCHERR** and **ROBERT MCGRAW** did willfully, that is with the intent to advance the conspiracy, and knowingly combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit wire fraud, an offense against the United States, that is, to knowingly and willfully, and with an intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate commerce, writings, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, and in doing so affected a financial institution, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

71.    The Grand Jury realleges and incorporates by reference paragraph 18 of this Indictment as though fully set forth herein as a description of the purpose of the conspiracy.

### Manner and Means of the Conspiracy

72.    In furtherance of this conspiracy, and to accomplish its object, the methods,

manner, and means that were used are described in paragraphs 19 through 54 of this Indictment and are realleged and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

COUNTS THREE THROUGH SEVEN
(18 U.S.C. §§ 1343 and 2 – Wire Fraud Affecting a Financial Institution)

73.     Paragraphs 1 through 57 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

74.     From at least in or around 2012 through at least in or around 2016, in the Northern District of Texas, and elsewhere, defendants **ANDREW SCHERR** and **ROBERT MCGRAW** aided and abetted by each other and others known and unknown to the Grand Jury, on or about the dates specified as to each count below, did knowingly, willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate commerce, writings, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, and in doing so affected a financial institution.

Purpose of the Scheme and Artifice to Defraud

75.     The Grand Jury realleges and incorporates by reference paragraph 18 of this Indictment as though fully set forth herein as a description of the purpose of the scheme and artifice.

The Scheme and Artifice to Defraud

76.     The Grand Jury realleges and incorporates by reference paragraphs 19 through 54 of this Indictment as though fully set forth herein as a description of the scheme

23

and artifice.

Use of the Wires

77.     On or about the dates specified as to each count below, **ANDREW SCHERR** and **ROBERT MCGRAW**, in the Northern District of Texas and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce for the purposes of executing such scheme and artifice, as set forth below:

| Count | Approximate Date | Description of Interstate Wire |
|-------|------------------|--------------------------------|
| 3 | **April 16, 2012** | **SCHERR** sent interstate email to Southport and Insurance Company A attaching materials for meeting with Texas Department of Insurance |
| 4 | **September 26, 2012** | **MCGRAW** sent interstate email to Insurance Company A attaching a subscription agreement for the purchase of interests in Destra UIT Series I, II, and III |
| 5 | **September 27, 2012** | Individual 1 sent interstate email to Insurance Company A attaching an "investment overview" for Destra UIT Series I, II, and III |
| 6 | **May 29, 2013** | **MCGRAW** sent interstate email to Insurance Company A attaching Destra subscription agreement |
| 7 | **January 10, 2014** | Individual 1 caused interstate email to be sent from Insurance Company A directing that $19,000,000 be wired to Bank A in order to purchase shares of Destra UIT Series I, II, III, and IV |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE NOTICE
18 U.S.C. §§ 981, 982, and 28 U.S.C. § 2461(c)

78.     Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of Count One, the defendants, **ANDREW SCHERR** and **ROBERT MCGRAW**, shall forfeit to the United States, any property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as the result of the Count One offense.

79.     Pursuant to 18 U.S.C. § 982(a)(2)(A), upon conviction of Count Two, the defendants, **ANDREW SCHERR** and **ROBERT MCGRAW**, shall forfeit to the United States, any property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as the result of the Count Two offense.

80.     Pursuant to 18 U.S.C. § 982(a)(2), upon conviction of any of Counts Three through Seven, the defendants, **ANDREW SCHERR** and **ROBERT MCGRAW**, shall forfeit to the United States, any property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as the result of the Counts Three through Seven offenses.

81.     Pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), if any of the property described above, as a result of any act or omission of the defendants:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty,

the United States intends to seek forfeiture of any other property of the defendants up to

the value of the forfeitable property described above.

A TRUE BILL

_____

FOREPERSON


ERIN NEALY COX
UNITED STATES ATTORNEY

_____
DANNY LAM NGUYEN
CAITLIN R. COTTINGHAM
Trial Attorneys
BRIAN KIDD
Deputy Chief
ROBERT ZINK
Acting Chief
Criminal Division, Fraud Section
United States Department of Justice

26

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

---

THE UNITED STATES OF AMERICA

v.

ANDREW SCHERR (1)
ROBERT MCGRAW (2)

---

SEALED INDICTMENT

Violation of 18 U.S.C. § 371
Conspiracy to Commit Crimes by or Affecting Persons Engaged in the Business of Insurance
(Count 1)

Violation of 18 U.S.C. § 1349
Conspiracy to Commit Wire Fraud Affecting a Financial Institution
(Count 2)

Violation of 18 U.S.C. §§ 1343 and 2
Wire Fraud Affecting a Financial Institution
(Count 3 - 7)

---

7 Counts

A true bill rendered

---------------------------------------------------------------------------------------------------------

DALLAS                                                                                    FOREPERSON

Filed in open court this ~~28th~~ 24th day of ~~August, 2018~~ April 2019.

---------------------------------------------------------------------------------------------------------

**Warrant to be Issued for all Defendants**

---------------------------------------------------------------------------------------------------------

UNITED STATES MAGISTRATE JUDGE
No Criminal Matter Pending